**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

JONNIE QUATTLEBAUM,

                               CASE NO. 1:16-cv-13031

        *Plaintiff*,            MAGISTRATE JUDGE PATRICIA T. MORRIS

*v.*

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant.*

_____/

## OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
## (Docs. 12, 18)

I.      **OPINION**

    A.    **Introduction and Procedural History**

        This is an action for judicial review of a final decision by the Commissioner of

Social Security denying Plaintiff Jonnie Quattlebaum's ("Quattlebaum") claim for

disability benefits under the Disability Insurance Benefits ("DIB") program of Title II, 42

U.S.C. § 401 *et seq*. (Doc. 1). The case is before the undersigned magistrate judge

pursuant to the parties' consent under 28 U.S.C. § 636(c), E.D. Mich. LR 72.1(b)(3), and

by Notice of Reference. (Docs. 16, 17). The matter is currently before the Court on cross-

motions for summary judgment. (Docs. 12, 18).

        On November 2, 2009, Quattlebaum filed an application for DIB alleging a

disability onset date of January 23, 2009. (Tr. 179-86). The Commissioner denied her

claim. (Tr. 104-10). Quattlebaum then requested a hearing before an Administrative Law

Judge ("ALJ"), which occurred on October 6, 2011, before ALJ Edward Bowling. (Tr.

44-103). The ALJ's written decision, issued February 24, 2012, found Quattlebaum not disabled. (Tr. 16-43). On February 20, 2013, the Appeals Council denied review. (Tr. 1-6). She appealed this denial, however, and the Commissioner decided not to oppose her action, requesting instead that the U.S. District Court for the Eastern District of North Carolina remand the case for further administrative proceedings. (Tr. 1319-25). Another hearing was held on May 6, 2015, before ALJ James Gramenos. (Tr. 1241-1312). He issued an unfavorable written decision on September 14, 2015, (Tr. 1209-40), and the Appeals Council later denied review, (Tr. 1194-99). Quattlebaum again filed for judicial review of that final decision on August 19, 2016. (Doc. 1).

## B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court

will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we condiser our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

## D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Quattlebaum not disabled. (Tr. 1209-40). At Step One, the ALJ found that Quattlebaum last met the insured status requirements of the Social Security Act on December 31, 2013, and had not engaged in substantial gainful activity in the interval between her alleged onset date of January 23, 2009 and her date last insured. (Tr. 1216). At Step Two, the ALJ concluded that the following impairments qualified as severe: pseudo seizures/seizures; chronic headaches; history of left knee surgery; degenerative disc disease of the lumbar spine; obesity; bipolar disorder; anxiety; and post-traumatic stress disorder. (Tr. 1216). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 1216-18). Thereafter, the ALJ found that Quattlebaum had the residual functional capacity ("RFC") to perform sedentary work, except

> Claimant can 'occasionally[]' . . . lift and/or carry weights not to exceed 10 pounds. Can 'frequently[]' . . . lift weights not to exceed 5 pounds. Able to engage in the positions of standing and/or walking in the work setting,

assuming normal work periods of work breaks, for an overall total of up to at least 2 hours during normal 8-hour work periods. Assuming normal breaks in an 8-hour work setting, has the functional abilities to engage in sitting positions for at least an overall period of 6-hours when performing work activity. Eliminate jobs from consideration that would require the worker, as related to specific job titles and duties, to engage bending form [sic] waist and/or knees to pick up objects or items from the floor level, other than rare situations. Eliminate jobs that by the DOT definition of the job title would require the worker to engage in reaching above the shoulder level with either upper extremity. Claimant shall not perform jobs that would have extremes of cold, heat, wetness, and humidity. Able to focus on the job for at least 2-hours at a time, taking into consideration normal 15 minute work break midway during the first 4-hours, during the meal period break, in addition to the 15-minute break midway during the last 4-hours of work. Claimant shall not engage in work activity in jobs that would have hazards in the work setting from unprotected areas such as moving machinery; heights; ramps; ladders; and scaffolding. Claimant is educated in the English language and has the basic mental abilities to understand, remember, and carry out unskilled work through instructions in the English language and/or demonstration. Is able to engage in unskilled work activity that does not require working with the general public, or a tandem type job with other workers. Claimant has the mental functioning abilities to respond appropriately to usual work situations, and with coworkers. Has the ability to get along with coworkers and supervisors without distracting them or exhibiting behavioral extremes. Claimant requires job assignments that would allow for superficial interactions with supervisors and coworkers.

(Tr. 1220-21). At Step Four, the ALJ found Quattlebaum did not have any past relevant work. (Tr. 1228). Proceeding to Step Five, the ALJ determined that jobs existed in significant numbers in the national economy that Quattlebaum could perform. (Tr. 1229-30).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has reviewed Quattlebaum's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### i.    Function Report

Quattlebaum filled out a Function Report on December 22, 2009. (Tr. 241-48). She described her typical day as waking up between nine or ten o'clock, feeding her pets and preparing a simple breakfast for herself, taking her medication and watching television until about noon when her husband comes home for lunch; thereafter, her child went to the babysitter for several hours, allowing Quattlebaum time to take a nap. (Tr. 241). Her conditions often prevented her from getting a full night's sleep: "I have no dreams, wake up several times a night, insomnia." (Tr. 242). They also affected a number of basic daily activities (*i.e.*, dressing and caring for her hair). She was no longer "able to be unsupervised cooking or baking" because "I'll forget a burner or the oven is on, don't remember how to use stove or oven." (Tr. 243). She retained the capacity to do laundry twice a week and vacuuming three times a week, though doing so took a while. (*Id.*). Her husband accompanied her to doctor's appointments and on dog walks because her seizures interfered with these activities. (Tr. 244). She could not pay bills, count change, handle a savings account, or use a checkbook/money orders. (*Id.*). She used to enjoy playing basketball as a hobby, but now "I can watch [television and] movies, all other

activities have stopped." (Tr. 245). On the weekends, a friend came to her house and spoke with her on the phone. (*Id.*). Other than this, she only visited doctors' offices on a regular basis. (*Id.*). "I no longer have any social activities due to my anxiety [and] panic attacks." (Tr. 246). Prompted to mark abilities with which she encountered difficulty, she marked: talking, seeing, memory, completing tasks, concentration, understanding, following instructions, and using her hands. (*Id.*). She could walk for up to two-hundred feet before needing five-minutes' rest "to calm myself down when I have a panic attack." (*Id.*). She could pay attention for ten to fifteen minutes, and did not finish what she started. (*Id.*). "I have to ask for help to understand what exactly is written on the page" when interpreting written instructions, and she had "to ask for help [and] be shown how to complete a task" if following spoken instructions. (*Id.*). Stress and changes in routine would trigger panic attacks. (Tr. 247). Concluding her report, she noted that her husband had helped her fill out the form and "read me the questions so I could give an answer . . . ." (Tr. 248).

On July 14, 2010, Quattlebaum filled out an additional Function Report with help writing from her husband, Thomas. (Tr. 278-91). The information contained therein is similar in all relevant respects with that provided in Quattlebaum's initial Function Report. The main changes are found in the information she provided about her abilities. She marked difficulty with: lifting, squatting, walking, kneeling, seeing, memory, concentration, and following instructions. (Tr. 289). She elaborated that the physical activities identified made her "very dizzy," and also that "my headaches make it difficult to see. I can't stay focused on instructions." (*Id.*).

Two separate Third-Party Function Reports from Thomas also appear in the record. (Tr. 209-16) (October 12, 2009); (Tr. 263-72) (June 28, 2010). These reports are consistent with each of the reports filed by Quattlebaum.

### ii. Quattlebaum's Testimony at the Administrative Hearing

At her most recent hearing, Quattlebaum began by answering several questions as to how her case ultimately wound up in Michigan, after an initial filing in Kansas and a later hearing in North Carolina. (Tr. 1244). When her case was remanded, she was "no longer out on the east coast," so it was sent to the present office. (*Id.*). At the time of the hearing, she was thirty-three years old and married, living with her husband and eight-year-old daughter. (Tr. 1245). Her weight had recently increased "about 100 plus pounds" due to "[l]ack of exercise, lack of diet, and medications." (Tr. 1246).

The main issues preventing her from working were a seizure disorder, chronic pain, and "bipolar and mental issues." (Tr. 1246). Her neck and lower back caused the most problems, and caused "constant pain." (Tr. 1246-47). She had used "several different kinds of treatment" over the years; "injections helped for about two weeks, but I'm still on pain medication for the remainder of the time due to you can only have so many injections per year." (Tr. 1247). The pain prevented her from sitting more than thirty minutes, and from standing more than ten minutes. (Tr. 1250). She could walk "[a]bout 100 feet before I have to stop and rest." (*Id.*). She could lift "[b]etween five and ten pounds" comfortably. (Tr. 1251). She spent the majority of each day laying down and watching television. (*Id.*).

She also suffered migraine headaches "[e]very other day," even when medicated. (Tr. 1247). They lasted "anywhere from 12 to 24 hours." (*Id.*). "[I]f the migraine is too bad then I have to go to the ER." (Tr. 1248). As for seizures, she generally had "petite mal seizures, which come on one to two a week through the whole month," but the "grand mal seizures" occurred less frequently, months apart. (*Id.*). The petite mal seizures lasted about a minute or two, and caused extreme fatigue. (Tr. 1249).

Asked to elaborate on her mental condition, Quattlebaum explained: I have severe depression due to my health issues. My bipolar is somewhat controlled, but I still have issues of [anger] outbursts, basically acting like an 8-year-old where I have outbursts. I have moments of clarity. Just a variety of things." (*Id.*). She also suffered panic attacks, which occurred "[a]ny time that I go in public, so probably two to four times a week." (Tr. 1250). Her anger was usually directed towards "friends, family, just in general anybody," caused by "a smallest little word or something put somewhere, something I don't like to family issues, money issues, those types of things." (Tr. 1255).

Due to her conditions, Quattlebaum had difficulty both falling asleep and staying asleep. (Tr. 1251). Each day, she would "usually take a nap for an hour to an hour and a half." (Tr. 1252). She also noted that "[m]y short term memory is not as well as it used to be." (*Id.*). For instance, she could no longer cook because "I almost burnt the house down a couple years ago, so I do none of the cooking." (*Id.*). She could still use the microwave. (Tr. 1254). She still struggled to "concentrate on one thing." (*Id.*).

Quattlebaum's medications had a number of side effects, including weight gain, depression, anger outbursts, and crying spells. (Tr. 1256). She did not go grocery

shopping, but was able to help with certain chores around the house, such as "[l]ight stuff like putting dishes in the dishwasher, folding laundry, just light things." (*Id.*). Her husband helped her bathe and get dressed. (Tr. 1257).

The ALJ moved on to questions about Quattlebaum's living situation. She noted that she lived with her daughter, but that her mother-in-law cared for her "as far as preparing meals for her, cooking for her, watching over her." (Tr. 1265). On occasion, Quattlebaum attended her daughter's running events, and would stand and watch for about thirty minutes before returning to her vehicle for the remainder of the time. (Tr. 1270-71). One of the reasons for this, as well as for the infrequency of her shopping, was her panic attacks, which were "very bad . . . when I'm in public." (Tr. 1270). She had them at home as well, though they were not so bad as when she was in public. (*Id.*). A "severe car wreck" triggered this problem in 2009. (*Id.*).

For a time, Quattlebaum attended Dodge City Community College in Kansas, and she "started working" in May 2008 until March 2009. (Tr. 1277). While at work, she indicated an ability to get along well with multiple people. (Tr. 1297). Every six months, her husband took her to visit a friend in Stow, Ohio. (Tr. 1292). She indicated that on the drive there, she laid down in the back of the car. (*Id.*). Other than her friend, Quattlebaum socialized with her mother and her sister. (Tr. 1293-95). About twice a month, she accompanied her husband to the grocery store. (Tr. 1296).

### iii.    The VE's Testimony at the Administrative Hearing

The ALJ then posed his first and only hypothetical to the VE:

[T]his hypothetical individual has a functional capacity to lift and/or carry weights that are defined as up to one third of the normal eight-hour work period not to exceed ten pounds of weight; is able to frequently lift and/or carry weights up to two thirds of the eight-hour work period not to exceed five pounds of weight. The issue of standing and/or walking in any work setting, able to engage in the positions of standing or walking in the work setting assuming normal periods of work breaks for an overall total up to at least two hours during a normal eight-hour work period. The sitting position, assuming normal breaks in any eight-hour work setting the hypothetical worker has the functional abilities to engage in sitting positions for at least an overall period of six hours when performing work activity. The hypothetical worker when engaged in work as to sitting/standing/walking, so during the work period, shall be allowed as needed alternating to the position of sitting, standing and/or walking for periods up to five minutes before resuming sitting, standing and/or walking. The same hypothetical individual would be allowed to resume the same options during the eight-hour work period as the worker feels necessary. Is that clear? . . . Eliminate from consideration jobs that would require bending from the waist and/or the knees to pick up objects or items from the floor level other than on rare situations should the job description require the picking up of objects or items from the floor level. Eliminate jobs that by the *Dictionary of Occupational Title* definition of the job title would require the worker to engage in reaching above the shoulder levels with either upper extremities. Environmental limitations, eliminate from consideration jobs that would have extremes of cold, heat, wetness or humidity. . . . As to the issue of focusing on the job, the hypothetical individual would be able to focus on the job for at least two hours at a time taking into consideration normal 15-minute work breaks midway during the first four hours as well as a 15-minute break midway during the last four hours of the work period. . . . Hazards in the work setting, eliminate from consideration jobs that would have hazards in the work setting from unprotected areas such as moving machinery, heights, ramps, ladders, and scaffolding. The next category is mental and/or communicative abilities and limitations. The same hypothetical individual is educated in the English language and can speak and understand the English language; has the basic mental abilities to understand, remember, and carry out very short and simple unskilled work through instructions in the English language and/or demonstration; the mental functional capacity to engage in unskilled work activity that does not require working in occupations with the general public or a tandem type of job that would require working with multiple coworkers or any coworker. I said multiple coworkers. That means more than one, correct? . . . So, jobs of unskilled work activity, the mental capacity to perform such work by the hypothetical individual, and to eliminate jobs that would require working in

occupations with the general public or a tandem type of job requiring working with one or more coworkers. Has the mental functional abilities to respond appropriately to usually [sic] work situations and with coworkers; has the ability to get along with coworkers and supervisors without distracting them or exhibiting behavioral extremes. And, lastly, the hypothetical worker requires job assignments that would only allow for superficial interactions with supervisors and/or coworkers. So, having completed the hypothetical question, what I'm directing to you is a request for you to consider the contents of the hypothetical questions to determine if there are specific unskilled job occupations that are functioning in the national economy that would accommodate essentially what I, in the hypothetical question, have described as a reduced range rather than a full range of unskilled sedentary occupation jobs.

(Tr. 1302-06). The VE indicated that certain jobs would exist, including: data entry clerk—with 104,000 national jobs—document preparer—with 93,000 national jobs—and bench assembler—with 277,000 national jobs. (Tr. 1306-07).

## F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the

impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved

to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir.

1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication .
        . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027,

1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

Furthermore, the claimant's work history and the consistency of his or her subjective

statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at

*5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the

groundwork for this, stating, "An individual shall not be considered to be under a

disability unless he [or she] furnishes such medical and other evidence of the existence

thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482

U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her]

limitations," and is measured using "all the relevant evidence in [the] case record." 20

C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all

credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human

Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-

14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

G.      **Analysis**

Quattlebaum furnishes two general arguments for remand in the instant Motion:

(1) the ALJ improperly evaluated the medical sources of record, (Doc. 13 at ID 3289-

96),[1] and (2) the ALJ's credibility analysis relies solely on unspecified, inconsistent objective medical evidence and thus is fatally flawed, (Doc. 13 at ID 3297-99). I address each argument in turn.

### 1.    The Weight Accorded Medical Sources

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 416.927(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). The ALJ "will always give good reasons. . . for the weight" given a "*treating* source's opinion." *Id* § (c)(2) (emphasis added). The ALJ, however, need not give 'good reasons' with respect to 'other sources'—rather, he "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have

---

[1] Tucked into this section of Quattlebaum's Motion are three arguments better suited to attacking the ALJ's credibility finding—(i) the ALJ erred in drawing inferences about her mental abilities from treatment notes regarding her physical impairments, (Doc. 13 at ID 3290-91); (ii) the ALJ improperly considered drug-seeking behavior when "[n]ot a single medical source in the record opined that [she] was exaggerating her mental impairments or malingering in any way," (Doc. 13 at ID 3292), and (iii) the ALJ equated "[t]he ability [to] get pregnant or even raise a child" with the ability to work full time, (Doc. 13 at ID 3293). Because these arguments are out of place in the present section, I discuss them instead in the section addressing Quattlebaum's credibility challenge below.

an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). There remains an important "distinction between what an adjudicator must consider and what the adjudicator must explain." *Id.*

In the instant case, Quattlebaum focuses her argument on the weight accorded Dr. Wichman's opinion.[2] According to her, "Dr. Wichman stated that his opinions were based on evidence of poor memory, sleep disturbance, personality change, mood disturbance, emotional lability, recurrent panic attacks, anhedonia, social withdrawal or isolation, intrusive recollections of a traumatic experience, and generalized anxiety, very poor coping mechanisms, extreme anxiety and depression, and poor emotional response to stressors," all of which, she suggests, find ample support in the record. (Doc. 13 at ID 3292-93). Moreover, she invokes the Sixth Circuit's language from *Gayheart v. Commissioner of Social Security*, 710 F.3d 365 (6th Cir. 2013)—that "conflicting substantial evidence" sufficient to undermine a treating physician's opinion "must consist of more than the medical opinions of the nontreating and nonexamining doctors"—for the proposition that the ALJ erred in assigning Dr. Wichman little weight. *Id.* at 377.

---

[2] In this section of her brief, Quattlebaum claims to challenge the ALJ's weighing of "the [m]edical [o]pinion [e]vidence" in general. (Doc. 13 at ID 3289). The content of the section, however, only fleshes out a challenge to the weight assigned Dr. Wichtman's opinion and, tangentially, the opinions of Dr. Hill and Dr. Stern. It fails to elaborate whatsoever on why the ALJ erred in his reasoning as to Dr. Hockersmith, Dr. Lawrence, Dr. Perll, Dr. Raju, Ms. Hawkes, Dr, Schwartz, Dr. Coleman, or any other medical source, waiving any such challenge thereto. *See, e.g.*, *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995))). For the same reason, it fails to develop any argument as to the ALJ's consideration of Quattlebaum's physical impairments. *Id.*

At the outset, I note that reliance on nonexamining state agency physicians is usually not error. "[A]n ALJ is permitted to rely on state agency physician's opinions to the same extent as she may rely on opinions from other sources." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015); *accord, e.g.*, *Wilson v. Colvin*, no. CV 15-13409, 2017 WL 370785, at *4 (E.D. Mich. Jan. 23, 2017), *report and recommendation adopted sub nom. Wilson v. Comm'r of Soc. Sec.*, No. 2:15-CV-13409, 2017 WL 710650 (E.D. Mich. Feb. 23, 2017) ("[T]he Sixth Circuit has squarely rejected Wilson's argument that an ALJ may not rely on a state agency consultant in determining a claimant's RFC."). So long as an ALJ does not rely *solely* on such nonexamining physicians when determining the weight to accord a treating physician—and substantial evidence bolsters his findings as to that physician—such reliance is not error. *See generally Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1309 (6th Cir. 1990) ("[T]he Secretary is not bound by the opinion of a treating physician where there is substantial evidence to the contrary.").

Expressly addressing Dr. Wichman's opinion, the ALJ wrote that it deserved little weight "given conflicting information identifying claimant's mental and physical functional capabilities." (Tr. 1227). In context, however, an extensive evidentiary discussion accompanied this summary statement. The ALJ also discussed, for instance, Quattlebaum's daily activities, (Tr. 1221), improvement in her condition over time, (Tr. 1223), noncompliance with medication, (Tr. 1223), relatively normal mental examinations, (Tr. 1225, 1127-28), her overall credibility, (Tr. 1223-27), as well as the other medical opinions of record, *e.g.*, (Tr. 1222) (Dr. Hockersmith and Dr. Lawrence);

(Tr. 1224) (Dr. Wichman); (Tr. 1225) (Dr. Perll and Dr. Raju); (Tr. 1226) (Ms. Hawkes and Dr. Schwartz); (Tr. 1227) (Dr. Coleman); (Tr. 1228) (Dr. Hill and Dr. Stern). To say that the only evidence inconsistent with Dr. Wichman's opinion came from nonexamining sources represents a severe mischaracterization of the ALJ's findings and the record itself, which validates the ALJ's findings. (Tr. 333, 367, 384, 423, 445, 461, 488, 568, 575, 589, 617, 622, 629, 635, 645, 650, 673, 779, 1858, 1975, 2171, 2954) (independence in activities of daily living); (Tr. 481, 887, 908, 913, 924, 1021, 1051, 1138, 1496, 1501, 1507, 1511, 1513, 1527, 1532, 1538, 1544, 1561, 1564, 1566, 1569, 1571, 1579, 2823) (improvement in mental condition and/or success in its treatment); (Tr. 585, 865, 1065, 1086, 1097, 2408) (noncompliance with medication); *see also* (Tr. 324, 326-27, 344, 346, 355, 374, 383, 390, 394, 400, 404, 425, 433, 438, 451, 468, 471, 490, 493, 501, 584, 623, 651, 678, 680, 682, 684, 686, 787, 879, 884-85, 893-94, 908, 911, 913, 924, 935, 940, 942, 953, 957, 966, 985-86, 989-90, 996, 1002-03, 1033-34, 1039, 1592-93, 1596, 1598, 1600, 1776, 1784, 1795, 1798, 1801, 1809, 1820, 1823, 1829, 1878, 1886, 1889, 1895-96, 1898-99, 1909, 1936, 1948, 1956, 1958, 1961, 1965-66, 1968, 1978, 1981, 1984, 2028, 2030, 2043, 2045, 2050, 2067, 2075, 2085-86, 2092-93, 2100-01, 2116, 2125, 2179, 2198, 2205, 2213, 2222, 2242, 2245, 2262, 2333, 2425, 2441, 2449, 2469, 2478-79, 2490-91, 2498-99, 2507, 2519, 2525, 2536, 2540, 2594, 2615, 2626, 2634, 2644, 2666, 2671, 2693, 2716, 2724, 2728, 2733, 2736, 2743-44, 2757, 2787, 2811, 2820-21, 2906, 2917, 2929, 2932, 3068, 3074, 3079) (denying anxiety and/or depression, or screening negative for psychological symptoms); (Tr. 327, 333, 344, 347, 358, 367, 384, 400, 404, 415, 445, 451, 461, 462, 466, 472, 482, 484, 488, 490,

568, 575, 589, 604, 617, 622, 629, 635, 641, 645, 651, 678-79, 681, 683-86, 693-94, 697, 704, 730, 779, 975, 984-92, 998, 1022, 1035, 1041, 1115, 1121, 1130, 1137, 1153, 1159, 1178, 1567, 1579, 1582, 1584, 1587) (alert and oriented); (Tr. 332, 366, 412, 461, 488, 617, 635, 645, 650, 693, 704, 779, 1547, 1840, 2110, 2406, 2519, 2940, 3183, 3186) (cooperative); (Tr. 1560, 1565, 1567, 1570, 1572, 1591-93, 1596-1602, 1797, 1803, 1880, 1887, 1889, 1937, 1949, 1953, 1957, 1966, 1980, 1986, 2029, 2045, 2051, 2076, 2093, 2102, 2110, 2220, 2260, 2263, 2267, 2406, 2427, 2442, 2450, 2500, 2509, 2641, 2689, 2694, 2698, 2703, 2717, 2724, 2726, 2734, 2745, 2758, 2788, 2804, 2822, 2940, 3076, 3140) (appropriate mood and/or affect); (Tr. 445, 451, 466, 488, 589, 604, 617, 622, 629, 635, 975, 1022, 1035, 1041, 1100, 1105, 1119, 1130, 1137, 1153, 1159, 1178, 1496, 1500, 1504, 1508, 1510, 1514) (well-nourished). Moreover, because "a psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment," *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989), a claimant's lack of credibility often reflects poorly on medical opinions which seem to mirror the claimant's subjective statements such as Dr. Wichtman's opinion.[3] *Accord, e.g.*, *Debra Angela Dettore, Plaintiff, v. Comm'r of Soc. Sec., Defendant.*, No. 1:17-CV-10397, 2017 WL 4699664, at *9 (E.D. Mich. Oct. 19, 2017) (noting that a claimant's lack of credibility may "contribute[] to the lack of supportability" in her doctor's findings); *Valerie Darlene Jackson, Plaintiff, v. Comm'r of Soc. Sec.*, No. 1:16-CV-14404, 2017 WL 4699721, at *7 (E.D. Mich. Oct. 19, 2017) (same). These are 'good reasons' for

---

[3] As will be shown, the ALJ's credibility analysis withstands scrutiny and should not be overturned.

discrediting a treating source's opinion. At the very least, the ALJ's detailed discussion of the evidence fulfills the goal of the pertinent regulations. *See, e.g.*, *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) ("[T]he procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

For these reasons, the record shows that the ALJ gave due consideration to Dr. Wichman's opinion—alongside the other opinions of record—and that substantial evidences buttresses his decision to assign it little weight. As such, Quattlebaum's argument as to the ALJ's weight assignments cannot prevail.

### 2.    Credibility

Quattlebaum next posits that the ALJ did not properly engage in the two-pronged test for gauging a claimant's evaluation of pain. (Doc. 13 at ID 3297-99). After determining that a claimant's medically determinable impairments could be expected to cause her symptoms, he rendered a "conclusory" finding that "unspecified 'objective' medical evidence does not support [] Quattlebaum's statements about her mental impairments . . . ." (Doc. 13 at ID 3298).

Quattlebaum is correct that an ALJ must not disregard "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work . . . solely because they are not substantiated by objective medical evidence." SSR 96-7p, 1996 WL 374186, at *1

(S.S.A. July 2, 1996). That is not, however, a reason the ALJ provided. Rather, the ALJ discussed Quattlebaum's tendency toward drug-seeking behavior and exaggeration of her symptoms, (Tr. 1223-24, 1226-27), her desire to have another child, (Tr. 1227), and evidence she had tried to deceive numerous medical sources of record as to her memory faculties and was in fact an adequate historian, (Tr. 1226-27). These reasons find ample support in the record. (Tr. 686, 698, 800, 810, 833-35, 865, 878, 881, 1097) (drug-seeking behavior noted); (Tr. 336-37, 693, 833-35, 850, 865) (exaggeration of symptoms); (Tr. 324, 327, 336-37, 466, 678-86, 693, 833, 850, 854, 996, 1574, 1591-1602, 1840, 2110, 2157, 2519, 2940, 3124) (demonstrating unimpaired memory); (Tr. 1560, 1562, 1565, 1567, 1570, 1572, 1591-1602, 1840, 2110, 2519, 2940, 3124, 3183, 3186) (showing no abnormalities in judgment and an ability to pay attention or concentrate).

Quattlebaum voices specific issues with several of these reasons, and argues: (i) the ALJ erred in drawing inferences about her mental abilities from treatment notes regarding her physical impairments, (Doc. 13 at ID 3290-91); (ii) the ALJ improperly considered drug-seeking behavior when "[n]ot a single medical source in the record opined that [she] was exaggerating her mental impairments or malingering in any way," (Doc. 13 at ID 3292), and (iii) the ALJ equated "[t]he ability [to] get pregnant or even raise a child" with the ability to work full time, (Doc. 13 at ID 3293). None have merit.

### i.      Memory Problems

Quattlebaum first questions the ALJ's conclusion that she "somehow managed to deceive four different mental health specialists to believe she has disabling mental

limitations simply because non-mental health sources did not record problems in her memory . . . ." (Doc. 13 at ID 3290). In her view, the "ALJ should not have drawn an adverse inference from the evaluations by sources that never assessed [her] mental functioning." (Doc. 13 at ID 3291). The ALJ did not, however, assume an absence of memory issues due to their absence from notes from non-mental health sources. Quite the contrary—numerous sources explicitly and repeatedly documented her intact memory. *E.g.*, (Tr. 324, 327, 336-37, 466, 678-86, 693, 833, 850, 854, 996, 1574, 1591-1602, 1840, 2110, 2157, 2519, 2940, 3124). When the ALJ detected this inconsistency, he was entitled to weigh it against Quattlebaum's credibility. *Cf. Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 665 (6th Cir. 2004) (deferring to an ALJ's credibility analysis because evidence showed "Essary was hypersensitive to pain," but also that "her allegations of pain were inconsistent with her ability to engage in various physical activities, and . . . her doctors could not determine the source of her pain despite the use of multiple diagnostic tools"). Her objection on this ground is not persuasive.

### ii. Drug-Seeking Behavior and Exaggerating Symptoms

Quattlebaum next attacks the ALJ's consideration of drug-seeking behavior and exaggeration of her symptoms. She confidently asserts that "[n]ot a single medical source in the record opined that [she] was exaggerating her mental impairments or malingering in any way." (Doc. 13 at ID 3291). This assertion is not well taken, for the record is replete with such instances. *E.g.*, (Tr. 834) ("During the interview Jonnie appeared to exaggerate her memory difficulties and concentration problems . . . . She did not understand the meaning of even simple proverbs. This appears to fly in the face of her

reported education level and job history."); (Tr. 1097) ("I have prescribed large numbers of Percocet tablets for this patient in the recent past. I will not be prescribing any more."); (Tr. 686) ("She is very persistent on trying to find a doc[tor]" to prescribe "opioids"); *see also* (Tr. 698, 800, 810, 833-35, 865, 878, 881) (drug-seeking behavior); (Tr. 336-37, 693, 833-35, 850, 865) (exaggeration of symptoms) *see, e.g.*, *Smith v. Comm'r of Soc. Sec.*, No. 13-10862, 2013 WL 6094745, at *6 (E.D. Mich. Nov. 20, 2013) ("[T]he fact that Plaintiff exhibited drug-seeking behavior weighs against her credibility."). The ALJ was permitted to weigh these instances against her credibility.

### iii. Desire To Have a Child

Lastly, Quattlebaum attempts to refute the ALJ's consideration of her desire to have another child. (Doc. 13 at ID 3292). Indeed, the ALJ included in his discussion the following line of reasoning: "While claimant has purported to nontreating and treating examiners on numerous occasions that she is unable to take care of her own basic needs, and her daughter's needs, the claimant has reported wanting another child. Claimant has undergone a reversal of her tubal ligation with a desire to have another child." (Tr. 1227). According to Quattlebaum, this rationale belies reversible error, for "[t]he ability to get pregnant or even raise a child does not automatically equate with the capacity to work 8 hours a day, 40 hours a week." (Doc. 13 at ID 3292). But Quattlebaum's argument mischaracterizes the ALJ's discussion. At no point did the ALJ equate her ability to have a child with the ability to work a full-time job. Rather, the ALJ incorporated her expressed desire into his consideration of her honesty and truthfulness—a claimant whose disability renders her unable to care for one child would likely not believe herself

capable of caring for a second child. *Cf. Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 543 (6th Cir. 2014) (upholding an opinion that considered the claimant's ability to care for children in reaching a decision); *Helsel v. Comm'r of Soc. Sec.*, No. 15-13599, 2016 WL 6070085, at *11 (E.D. Mich. Sept. 7, 2016), *report and recommendation adopted,* No. 15-13599, 2016 WL 6030522 (E.D. Mich. Oct. 14, 2016) (same). Nor was this the only factor, as discussed above; many other considerations led the ALJ to his conclusion as to Quattlebaum's credibility.

Put simply, the ALJ supplied a cohesive rationale for his adverse credibility determination, buttressed by substantial evidence, and this Court should not disturb it. *See generally Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997))).

## H.    Conclusion

For the reasons stated above, the Court finds that the ALJ's decision, which ultimately became the final decision of the Commissioner, is supported by substantial evidence.

**II.    ORDER**

In light of the above findings, **IT IS ORDERED** that Quattlebaum's Motion for

Summary Judgment, (Doc. 12), be **DENIED**, the Commissioner's Motion, (Doc. 18), be

**GRANTED**, and this case be **AFFIRMED**.

Date:  November 2, 2017                     S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge


**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date
through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: November 2, 2017                      By s/Kristen Castaneda
                                            Case Manager